UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIK RUSSELL,

          Plaintiff

    v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

          Defendants

Case No. C-12-00929-JCS

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 48

## I.    INTRODUCTION

Plaintiff Erik Russell brings this civil rights action against the City and County of San Francisco and Officer Damien Reyes alleging that excessive force was used against him while he was in police custody on August 16, 2011.  Defendants bring a Motion for Summary Judgment ("the Motion") seeking dismissal of all of Plaintiff's claims.  A hearing on the Motion was held on Friday, May 31, 2013 at 1:30 p.m.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

### A.    Facts[2]

On August 16, 2011, Russell began drinking alone at home around 7:00 p.m.  Joint Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ("JSUF") ¶ 1 (citing Russell Dep. 25:2-6; 26:4-7).  After having two or three cocktails in one hour, he went to a bar, the Bitter End on Clement Street, to continue drinking.  *Id*. ¶ 2 (citing Russell

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] Unless otherwise stated, the facts in this section are undisputed.

United States District Court
Northern District of California

Dep. 25:9-17; 26:16-18).  Russell stayed at the Bitter End for approximately 40 minutes, where he drank two to five beers.  *Id*. ¶ 3 (citing Russell Dep. 26:23-27:9).  Russell then went across the street to another bar for more drinks.  He stayed there an hour.  *Id*. ¶ 4 (citing Russell Dep. 27:13-28:10).  He has no memory of how many drinks he had there, but remembers that "there was whiskey involved."  *Id*.  Then Russell left, intending to return to the Bitter End.  *Id*. ¶ 5 (citing Russell Dep. 28:19-21).  Russell estimates that by that point in the evening, three hours after he began drinking, he had consumed between 10 and 11 drinks, though he testified at his deposition that "at some point I had said 10-15" drinks.  *Id*. ¶ 6 (citing Russell Dep. 28:24-29:17).

Around 10 p.m., Russell began to cross Clement Street mid-block between Fifth and Sixth Avenues.  *Id*. ¶ 9 (citing Russell Dep. 33:9-20).  Russell was feeling drunk and dizzy and was staggering.  *Id*. ¶ 10 (citing Russell Dep. at 39:9-16).  Officer Stratton was driving a marked police vehicle westbound on Clement Street between Fifth and Sixth Avenues.  *Id*. ¶ 11 (citing Stratton Decl. ¶ 3).  Her partner that day was Officer Jennifer Irwin, who was sitting in the passenger seat of the police vehicle.  Stratton Decl., ¶ 3.  Officer Stratton saw Russell stagger into  the street from the northbound side.  JSUF ¶ 11 (citing Stratton Decl. ¶ 3).  Officer Stratton had to slam on the brakes to avoid hitting Russell.  *Id*.  At least one other vehicle on Clement Street also had to stop suddenly to avoid hitting Russell.  *Id*. ¶ 12 (citing Stratton Decl. ¶ 5).

Concerned for Russell's safety, Officer Stratton left the car in the street and ran after Russell.  *Id*. ¶ 13 (citing Stratton Decl. ¶ 6). Russell completed crossing the street, turned right on the sidewalk on the southbound side of Clement Street, and walked westbound toward Sixth Avenue. *Id*. ¶ 14 (citing Stratton Decl. ¶ 7).  As she chased Russell, Officer Stratton called repeatedly for Russell to stop, but he continued walking as though he did not hear her.  *Id*. ¶ 15 (citing Stratton Decl. ¶ 8).  Finally, near the corner of Fifth Avenue and Clement Street, Officer Stratton caught up with Russell.  Russell stopped walking.  *Id*. ¶ 16 (citing Stratton Decl. ¶ 9).

It appeared to Officer Stratton that Russell was intoxicated: he had a strong odor of alcohol on his breath and clothing; he had very watery, bloodshot eyes; his face was flushed; he was sweating; and his speech was slurred, slow and thick.  *Id*. ¶ 17 (citing Stratton Decl. ¶ 10). Officer Stratton had a brief conversation with Russell in which he told her that he had just been to a bar

United States District Court
Northern District of California

2

and was going to another bar to drink more. *Id*. ¶ 18 (citing Stratton Decl. ¶ 11). Officer Stratton asked Russell for his identification; he responded by saying something along the lines of "Fuck you." *Id*. ¶ 19 (citing Stratton Decl. ¶ 12). Officer Stratton noted that Russell was swaying and seemed to be having trouble standing, so she put her arm around him to keep him from falling. *Id*. ¶ 20 (citing Stratton Decl. ¶ 13). Given his state, Officer Stratton was afraid that Russell would fall if he attempted to sit down. *Id*. Officer Stratton told Russell that he would be taken to the station for four hours and would be released when he was sober. *Id*. ¶ 21 (citing Stratton Decl. ¶ 14). As she spoke to him, Russell responded by repeatedly swearing and saying "Fuck you." *Id*. ¶ 22 (citing Stratton Decl. ¶ 15).

Officers Chu and Navarro arrived at the scene and transported Russell to Richmond Station. *Id*. ¶ 24 (citing Stratton Decl. ¶ 16). Officers Stratton and Irwin returned to their vehicle and drove to Richmond Station. *Id*. ¶ 25 (citing Stratton Decl. ¶ 17).

Officer Reyes was working as station keeper at Richmond Station at the time Russell arrived. *Id*. ¶ 26 (citing Reyes Decl. ¶ 2). Officer Reyes observed Russell and concluded that he was under the influence because he smelled of alcohol, slurred his words, and was staggering. *Id*. ¶ 27 (citing Reyes Decl. ¶ 3). Officer Reyes agreed that Russell would stay in the station until he had sobered up enough to care for himself. *Id*. ¶ 28 (citing Reyes Decl. ¶ 4). According to the declaration provided by Officer Stratton in the official incident report, when Russell arrived, he was booked for "[p]ublic intoxication, release when sober." Declaration of Panos Lagos in Support of Plaintiff's Response/Opposition to Defendants' Motion for Summary Judgment ("Lagos Decl."),  Decl., Ex. A. Officer Stratton stated, "[u]pon removing Russell's property, Russell was placed on the bench in the holding cell area. Russell was secured with his left hand via a single handcuff to the two foot bar that is secured to the wall behind the bench." *Id*. Officer Stratton does not identify the officer who secured Russell in the holding cell area; nor does Officer Reyes include this information in his declaration. In his deposition, however, Officer Reyes testified that he "conclude[d] on August 16 to [his] satisfaction that Mr. Russell was in fact handcuffed to one of the bars. . . [o]nce he was brought in." Lagos Decl., Ex. C (Reyes Dep.) at 23. Russell repeatedly demanded to be released and to have the "fucking cuffs" taken off.  JSUF

United States District Court
Northern District of California

¶ 29 (citing Reyes Decl. ¶ 5; Russell Dep. 50:11-23).  Russell did not want to be there and wanted to go home. *Id.*

Less than an hour after Russell's arrival at the station, Officer Weems arrived to relieve Officer Reyes as station keeper.  *Id.* ¶ 30 (citing Reyes Decl. ¶ 6). As Officer Reyes was preparing to leave, he heard what sounded like loud banging, kicking and yelling noises coming from the holding area.  *Id.* ¶ 31 (citing Reyes Decl. ¶ 7). Concerned that Russell needed attention, Officer Reyes told Officer Weems that he would check on Russell on his way out of the station.  *Id.* ¶ 32.

Officer Reyes opened the main door to the holding area by pulling it towards him.  *Id.* (citing Reyes Decl. ¶ 8 & Ex. A).   What followed is disputed.   The account of Officer Reyes in his declaration is as follows:

> 9. I stepped into the doorway and, before I could fully enter the holding area, and before I was able to see where Plaintiff was, I was immediately kicked in the left thigh by Plaintiff.
>
> 10. Stunned and in some pain, I fell to my right to the floor against the wall of the holding cell. I landed in a seated position on my right side, facing the hallway.
>
> 11. While I was on the floor with my right side against the south wall, Plaintiff attempted to kick me again, which I blocked with my hand. Plaintiff also swung his hand in an attempt to hit me.
>
> 12. At this point, Plaintiff stood in front of the main door, facing towards me. Because Plaintiff had attempted to hit me, I knew that Plaintiff had at least one hand free, and I did not know whether Plaintiff's other hand was also free.
>
> 13. I did not have sufficient time to determine whether Plaintiff's other hand was handcuffed before taking action, as Plaintiff was continuing to attack me.
>
> 14. I did not believe that I could safely escape in any direction without being struck again because Plaintiff was merely three or four feet away and was able to reach me.
>
> 15. The south wall was too close for me to escape in that direction.
>
> 16. I did not believe that I could escape back through the main door because (1) I did not know if the door was open; and (2) if closed, the door locks automatically and requires one to enter a code to open it. I did not have sufficient time to determine whether the door was open.
>
> . . .
>
> 20. I stood up and struck a single distraction blow with a closed fist to Plaintiff's left cheek area. . . .

1  Declaration of Officer Damien Reyes in Support of Defendants' Motion for Summary Judgment

2  ("Reyes Decl."), ¶¶ 9-16, 20.

3      Officer Reyes' account in the Incident Report statement that he gave just after the relevant

4  events is somewhat different, stating, in part, as follows:

> I opened the door to the holding area to check on the prisoner and I
> was immediately kicked on the left leg by a white male later
> identified as Erik Russell who was single handcuffed by the left
> wrist to the bar above bench.  After Russell kicked me, he attempted
> to kick me again with his other leg.  I was able to block Russell's
> second kick by using a swiping motion with my left arm.  As I
> blocked Russell's second kick, Russell used his open right hand and
> used a backhand to strike me on the right side of my jaw.
>
> In order to stop Russell's attack on me, fearing that he would strike
> me again and in self[-]defense I used my right fist to strike Russell's
> face area near his left cheek.  My strike of Russell not only served to
> distract him but it also gave me the opportunity [to] back away from
> Russell and yell for assistance from fellow officers.  After I struck
> Russell his head went backwards and made contact with the metal
> wall in the bench area.

Lagos Decl., Ex. A;[3] *see also* JSUF ¶ 36 ("Officer Reyes left the area and immediately prepared a

statement about what had occurred").

    Russell does not remember Officer Reyes punching him or the events that led up to the

punch.  Plaintiff's Declaration in Support of Response/Opposition to Defendants' Motion for

Summary Judgment ("Russell Decl."), ¶ 8.   Nor does he remember whether he kicked or hit

Officer Reyes.  *Id.*  However, he questions Officer Reyes' account because he suffers from a

disease known as Ankylosing Spondylitis, a disabling condition that affects his right big toe and

which would have made kicking Officer Reyes extremely painful and thus, he contends, unlikely.

*Id.* ¶¶ 4, 8 & Ex. M  (photograph  of right big toe at time of relevant events showing blistering).

He also states that he had a sore on his right leg resulting from "vein/blood flow problems" that

was painful to the touch on the date of the incident.  *Id.*  ¶ 5 & Ex. N.  According to Russell, the

---

[3]  The Court notes that Defendants object to this exhibit on the basis that it is not properly
authenticated and is hearsay.  *See* Reply Brief at 2-3.  The Court overrules the objection.  First, to
the extent Defendants do not challenge the accuracy of the Incident Report, the Court concludes
that at trial it could be properly authenticated. Second, the statements by Officer Reyes in the
Incident Report could certainly be used at trial during cross-examination.

1    sore on his leg also makes it unlikely that he kicked Officer Reyes.  *Id.* ¶ 8.

2         The parties do not dispute that Russell was approximately three or four feet away when

3    Officer Reyes struck him.  JSUF ¶ 33 (Reyes Decl. ¶ 20).  It is also undisputed that upon being

4    struck, Russell fell back into a seated position on the bench, and his head struck the wall.  *Id.* ¶ 34

5    (citing Reyes Decl. ¶ 21).

6         Immediately after these events occurred, Sergeant Morales completed a use of force

7    investigation.  *Id.* ¶ 37 (citing Morales Dep. 21:14-25; 24:15-25:1).  As part of his investigation,

8    Sargeant Morales spoke with Officer Reyes and other officers at the station, took photographs of

9    Russell in which Russell can be seen smiling and giving a "thumbs up" sign, and viewed the area

10   where the incident occurred.  *Id.* ¶ 38 (citing Morales Dep. 21:14-20; 26:22-27:7; 31:2-5; Russell

11   Dep. Exs. E-I).  Sergeant Morales concluded, "[b]ased on Plaintiff's attack, Plaintiff's height and

12   size advantage, Plaintiff's intoxicated behavior, [and] on Officer Reyes being in the holding area

13   alone in a confined space," that the force used by Officer Reyes was not excessive in light of the

14   circumstances.  *Id.* ¶ 39 (citing Morales Dep. 40:11-20).

15        At his deposition, Officer Morales testified that in determining whether the force used by

16   Officer Reyes was reasonable he did not consider what other options were available to Officer

17   Reyes under the circumstances;  nor did he ask Russell for an account of what occurred.  Lagos

18   Decl., Ex. I (Morales Dep.) at29-31.   Officer Morales testified that he did not ask Officer Reyes

19   why he did not take a step back to avoid injury because it was his understanding of police policy

20   and the law that when "police officers are confronted with force we are not obligated to back off,

21   retreat."  *Id.* at 35-36.   Officer Morales also testified that when he conducted his investigation he

22   knew that Russell was handcuffed with one hand to the bench because Officer Reyes had told him

23   so.  *Id.* at 31.  Officer Morales testified that he has conducted approximately 20-25 use of force

24   investigations and has never found that the force used was unreasonable.  *Id.* at  22-23.  According

25   to Officer Morales, if he were to find that a particular use of force were unreasonable he would be

26   required to notify a supervisor and document his findings in a memorandum, but he has never

27   written such a memorandum as he has never investigated a use of force that he found

28   unreasonable.  *Id.* at 24-25.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Subsequently, Russell was transported by ambulance to the emergency room at UCSF,

2    where he was treated for injuries to his neck and head.  *Id.* ¶ 40.  Russell was released the next

3    morning and took a bus home.  JSUC ¶ 41 (Russell Dep. 53:13-14; 55:2-3).  He testified that at the

4    hospital a "surgical bandage" was used to "take care of the wound on [his] head and [his] eye" and

5    he was put in a "neck collar."  Mongan Decl., Ex. A-1 (Russell Dep.) at 54. He further testified

6    that he suffered a "fractured neck, C5 vertebrae; a black eye . . . [and a] one-inch laceration" to the

7    back of his head.  *Id.* at 66.  Medical records from UCSF reflect that he was treated for a head

8    laceration and a c-spine fracture.  Russell Decl., Ex. O.  According to Russell, he did not have

9    these injuries prior to the incident involving Officer Reyes.  Russell Decl., ¶ 11.

10    Officer Reyes is 5'3" tall.  *Id.* ¶ 26 (citing Reyes Decl. ¶ 2).  Russell is 6'2" tall and the

11    length of his arms from top of shoulder to wrist is at least two feet.  *Id.* ¶ 8 (citing Russell Dep.

12    88:15-19).   On the date of the incident at issue in this case, Russell weighed 162 pounds. *Id.* ¶ 8

13    (citing Russell Dep. 88:15-19).  The handcuffs that secured Russell were approximately 9 inches

14    long: a chain of approximately 2 inches connected two handcuffs which, when closed, each

15    measure 3.5 inches in diameter.  *Id.* ¶ 35.

16    **B.    Procedural Background**

17        **i.    The Complaint**

18    In his complaint, Russell asserts the following claims based on the events described above:

19    1) violation of civil rights under 42 U.S.C. § 1983 based on alleged use of excessive force under

20    the Fourth and Fourteenth Amendments, asserted against Officer Reyes ("the excessive force

21    claim"); 2) violation of civil rights under 42 U.S.C. § 1983 based on alleged failure to prevent a

22    pattern of use of excessive force by Officer Reyes under the Fourth and Fourteenth Amendments,

23    asserted against the City and County of San Francisco ("the City") and Officer Reyes under

24    *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978);  3) assault,

25    against Officer Reyes; 4) battery, against the City and Officer Reyes; 5) intentional infliction of

26    emotional distress (" the IIED claim"), against the City and Officer Reyes;  6) negligence, against

27    the City and Officer Reyes; 7)  violation of civil rights under 42 U.S.C. § 1983 based on negligent

28    selection and training of police officers, against the City; 8) violation of civil rights under

7

1  California Civil Code Section 52.1, against the City and Officer Reyes; 9) injunctive and

2  declaratory relief against the City and Officer Reyes.[4]

3        **ii.   The Motion**

4        Defendants assert that there is no admissible evidence that would allow a jury to

5  reasonably conclude that Officer Reyes' account of the relevant events is untrue given that Russell

6  has no memory of what occurred and there were no witnesses to the incident other than Russell

7  and Officer Reyes.  Motion at 1, 8-14.   Further, Defendants argue, based on Officer Reyes'

8  account, the single blow was a reasonable use of force under the circumstances, applying the

9  standard set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989).   Because all

10  of Russell's claims turn on the reasonableness of the force used by Officer Reyes, according to

11  Defendants, the entire action should be dismissed.  In addition, Defendants assert that they are

12  entitled to summary judgment as to Plaintiff's claims on a number of other grounds as well.

13        First,  as to the excessive force claim, Defendants contend that Officer Reyes is entitled to

14  qualified immunity  because even assuming he used excessive force, his mistake was reasonable in

15  light of clearly established law.  *Id*. at 14-16.

16        Second, Defendants challenge the *Monell* claims (Claims Two and Seven), on the ground

17  that Russell has  not offered evidence showing that the City is the "moving force" behind

18  Russell's alleged injuries.  *Id*. at 15-17.  In particular, as to Claim Two, Defendants assert that

19  there is no evidence that Officer Reyes or any other officers engaged in a pattern of ongoing

20  constitutional violations or that the City was aware of any such pattern and failed to address it

21  such that it caused Russell's injury.  *Id*. at 16-17.   Similarly, Defendants argue that the *Monell*

22  claim based on inadequate training and supervision (Claim Seven) fails because there is no

23  evidence of a constitutional violation of which the City was aware that was the result of

24  inadequate training.  *Id*. at 17.

25        Third, Defendants assert that Russell lacks standing to seek injunctive or declaratory relief

26  under 42 U.S.C. § 1983 because he has not presented evidence that the alleged constitutional

27

28  [4] Claims Two, Seven and Nine were also asserted against the Chief of Police, Greg Suhr.  Chief Suhr was subsequently dismissed from this action as a defendant.

United States District Court
Northern District of California

8

United States District Court
Northern District of California

violation is likely to occur again.  *Id*. at 17-19.

Fourth, Defendants argue that because the assault and battery claims require that the force used be unreasonable, these claims fail for the same reason the excessive force claim fails.  *Id*. at 19.

Fifth, Defendants contend Russell's IIED claim fails because Russell has presented no evidence of conduct that a jury could find was "extreme and outrageous."  *Id*. at 19-20.

Sixth, Defendants assert that Russell's negligence claim fails because Russell has not offered any evidence that Defendants had a duty to Russell or that any duty was breached.  *Id*. at 20-21.

Seventh, with respect to the Bane Act claim, asserted under Section 52.1 of the California Civil Code, Defendants assert the claim fails not only because it depends on Russell's prevailing on his Fourth Amendment excessive force claim but also because Russell is unable to show that the force used by Officer Reyes prevented Russell from exercising his constitutional rights through "threats, intimidation or coercion."  *Id*. at 21-22.

Finally, to the extent Russell asserts his state law claims against the City, Defendants argue that there is no statutory basis for these claims.  *Id*. at 23.

### iii.    Opposition

In his Opposition, Russell argues that there is evidence sufficient to demonstrate a material dispute of fact as to all of his claims.  Opposition at 1.   With respect to his excessive force claim, Russell contends that there are fact questions based on inconsistencies in Officer Reyes' initial account of the incident and his later testimony.  *Id*. at 1-2, 4, 10.   In particular, Russell points to the following alleged inconsistencies in Officer Reyes' account:

- In his initial incident report, Officer Reyes did not state that he fell to the ground after being kicked by Russell whereas in subsequent testimony, Officer Reyes stated that after he was kicked he fell to the ground in a sitting position.  *See* Lagos Decl., Ex. A (Incident Report);  Ex. C (Reyes Dep.) at 14-15.

- During his deposition, Officer Reyes testified both that Russell was sitting at the time Officer Reyes struck him and that he was standing.  *See* Lagos Decl., Ex. C (Reyes Dep.)

1     at 24 (sitting), 34 (standing), 35 ("towering over at a close distance").

2   • Officer Reyes stated in his declaration that he did not think he could safely escape because

3     Russell was only 3 or 4 feet away but does not explain why he could not have taken a step

4     backwards to get out of Russell's reach.  Reyes Decl., ¶ 14;  Lagos Decl., Ex. C (Reyes

5     Dep.) at 33, 38, 39, 42;  *see also* Lagos Decl., Exs. D & E (DVDs showing site inspection

6     of holding cell).

7   • Officer Reyes testified he knew one of Russell's arms was free and that he did not have

8     time to determine whether the other was handcuffed, but he also testified that it is standard

9     procedure when a custody is place in a holding cell to handcuff at least one or both hands

10    to the safety bar and that in his experience no custody had ever been held in the holding

11    cell without having at least one arm handcuffed.  Reyes Decl., ¶ 13; Lagos Decl., Ex. C

12    (Reyes Dep.) at 18-19, 21-22;  *see also* Lagos Decl., Ex. F (Stratton Dep.) at 18 -20

13    (testimony that whether custody is handcuffed by both hands or just by one is at the

14    discretion of the officer and depends on level of compliance and threat perceived);  Ex. I

15    (Morales Dep.) at 42 (testimony by Officer Morales that prisoners are always handcuffed

16    by at least one arm when they are in the booking bench area).

17   Russell also points to evidence that he contends creates a fact question as to whether he

18 kicked Officer Reyes or acted in an aggressive manner prior to being punched.  In particular, he

19 cites the following evidence:

20   • Testimony by Officer Stratton that Russell did not resist when she placed him in handcuffs.

21     Lagos Decl., Ex. F (Stratton Dep.) at 16, 48.  According to Russell, this evidence shows

22     that he was "not violent, aggressive, or resistant, to his arrest" and therefore he is entitled

23     to an inference that his "compliance continued and that no attempt whatsoever was made

24     by him to assault [Officer] Reyes."  Opposition at 10.

25   • Evidence that Russell suffered from Ankylosing Spondylitis and had a sore on his leg and

26     therefore would have been in great pain if he had kicked Officer Reyes as alleged.  *See*

27     Russell Decl., ¶¶ 3-8.

28   • A copy of an SFPD policy listing circumstances in which individuals are not to be detained

United States District Court
Northern District of California

in district station holding cells, including "[a]ggressive or combative persons who pose a threat to other persons or to the facilities." Lagos Decl., Ex. K. According to Russell, this policy supports the inference that Russell was not acting in an aggressive or combative manner. Opposition at 4.

In addition to the evidence summarized above, Russell also points to General Order 5.01 on "Use of Force," which requires that officers exhaust other reasonable alternatives before using force and permits force to be used only under specific circumstances; the only applicable one in this case is self-defense, Russell argues, and there is a fact question on that issue. *Id.* at 12. According to Russell, the question of whether Officer Reyes violated the Police Department policy on use of force is relevant to whether he acted reasonably for the purposes of Russell's excessive force claim. *Id.*

Russell argues that Officer Reyes is not entitled to qualified immunity because a reasonable officer would have known that under *Graham* and existing Ninth Circuit case law, a fist strike to the face of a man handcuffed to a wall "resulting in a fractured neck was unnecessary and excessive." *Id.* at 14.

With respect to Russell's *Monell* claim,[5] Russell contends there is a fact question because Officer Reyes has not been disciplined, amounting to a ratification of the force used by Officer Reyes, and there is a de facto policy of using more force than is required under the circumstances. *Id.* at 15-16. Russell cites testimony by Officer Morales regarding the use of force investigation, including his failure to ask Officer Reyes why he didn't take a step back, his failure to consider whether other options were available to Office Reyes, his "gross misunderstanding" of the legal requirements governing the use of force, and the fact that he had conducted many such investigations and had never found that the force used was excessive. *Id.* at 16. Plaintiff points to the San Francisco Police Department's General Order 5.01 as evidence of the official policy, limiting the use of force "to the degree minimally necessary to accomplish a lawful police task." *Id.*; *see* also Lagos Decl., Ex. L (General Order 5.01). Plaintiff contends this official policy is not

---

[5] Plaintiff refers to a single *Monell* claim. It is unclear whether his arguments are aimed at Claim Two, Claim Seven or both of those *Monell* claims.

1    followed and that instead, a de facto policy of condoning excessive force is followed.[6]  *Id.*

2        Russell argues that there is a fact question as to the IIED claim because he suffered a

3    fractured vertebrae as a result of the force used against him by Officer Reyes.  *Id.* at 17.

4        Russell also rejects Defendants' argument that his Bane Act claim fails because Russell is

5    unable to establish that "threats, coercion, or intimidation" were used to deprive him of his

6    constitutional rights, citing cases in which excessive force has been found to support a Bane Act

7    claim.  *Id.* at 17-22.

8        As to Defendants' assertion that Plaintiff has failed to offer any theory in support of

9    asserting his state law claims against the City, Plaintiff cites California Government Code Section

10   815.2(a).  *Id.* at 17.

11       Finally, Russell argues that to the extent there is a fact question as to whether Defendants

12   have engaged in a persistent pattern and practice of misconduct, a fact question also remains as to

13   his claim for injunctive relief.  *Id.* at 23-24.

14           iv.    **Reply**

15       In their Reply brief, Defendants reiterate the arguments asserted in their Motion and assert

16   that Russell has applied the wrong legal standard. Reply at 1-2.  In particular, on summary

17   judgment the Court must draw only *reasonable* inferences in favor of the party opposing the

18   motion.  *Id.*  On the other hand, it may not draw speculative inferences in favor of the party

19   opposing summary judgment where there is undisputed evidence that supports a contrary

20   conclusion.  *Id.*  Defendants contend Russell is asking the Court to draw such speculative

21   conclusions to deny summary judgment.

22   **III.   ANALYSIS**

23       **A.    Legal Standard under Rule 56**

24       Summary judgment on a claim or defense is appropriate "if the movant shows that there is no

25   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

26

27   [6] Plaintiff also cites the testimony of a police practices expert, Don Cameron, offered in another
     case, that General Order 5.01 could be written better.  *Id.* at 16-17.  However, Plaintiff does not

28   articulate any coherent theory as to how that testimony is sufficient to demonstrate a fact question
     on his *Monell* claim in this case.

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

1   Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the

2   absence of a genuine issue of material fact with respect to an essential element of the non-moving

3   party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at

4   trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this

5   showing, the burden then shifts to the party opposing summary judgment to designate "specific

6   facts showing there is a genuine issue for trial."  *Id*.  On summary judgment, the court draws all

7   reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372, 378

8   (2007).

9       **B.      Federal Claims Under 42 U.S.C. § 1983**

10          **i.      Legal standard for section 1983 claims based on alleged excessive force**

11          Section 1983 provides "a method for vindicating federal rights elsewhere conferred."

12   *Graham v. Connor*,  490 U.S. 386, 393-94 (1989) (citation omitted)).  Thus, analysis of a civil

13   rights claim brought under § 1983 begins with the identification of the "specific constitutional

14   right allegedly infringed by the challenged application of force."  *Id*. at 394 (citation omitted).

15   The claim is then evaluated under the constitutional standards that apply to that constitutional

16   right.  *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)). Russell's excessive force claim is

17   asserted under the Fourth Amendment and therefore is analyzed under the Fourth Amendment's

18   "objective reasonableness" standard.  *Arpin v. Santa Clara Valley Transportation Agency*, 261

19   F.3d 912, 921 (9th Cir. 2001).

20          "In considering an excessive force claim, [courts] balance 'the nature and quality of the

21   intrusion on the individual's Fourth Amendment interests against the countervailing governmental

22   interests at stake.'"  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Determining whether the force

23   used was reasonable "requires careful attention to the facts and circumstances of each particular

24   case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

25   the safety of the officers or others, and whether he is actively resisting arrest or attempting to

26   evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Of these factors, the Ninth

27   Circuit has held that the most important is "whether the suspect poses an immediate threat to the

28   safety of the officers or others."  *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  "Thus,

United States District Court
Northern District of California

United States District Court
Northern District of California

where there is no need for force, any force used is constitutionally unreasonable." *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated on other grounds, 534 U.S. 801 (2001); *see also Lolli v. County of Orange*, 351 F.3d 410, 417 n. 5 (9th Cir. 2003) ("*Headwater's* excessive force holding remains good law, notwithstanding that the opinion was vacated and the case remanded").

The Court's inquiry is not limited to the three factors specifically enumerated in *Graham*, however, because "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

### ii.      Whether there is a fact question as to whether excessive force was used

As a preliminary matter, the Court addresses the quantum of force used against Russell. While Officer Reyes punched Russell only once, it is undisputed that the punch required Russell to be taken to the emergency room for treatment.  There is also evidence in the record that Russell suffered from a laceration and a fractured neck as a result of the punch.  *See* Russell Decl., ¶ 11.[7] Drawing all reasonable inferences in Russell's favor, the Court finds that Officer Reyes' blow was "'capable of inflicting significant pain and causing serious injury,' and as such '[is] regarded as "intermediate force"' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests.'" *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (quoting *Young v. County of L.A.*, 655 F.3d 1156, 1161–62 (9th Cir. 2011)).   In this context, the Court addresses the factors set forth in *Graham* and its progeny to determine whether Defendants are entitled to summary judgment on the basis that the force used against Russell was reasonable.

First, the Court addresses the most significant *Graham* factor, whether Russell posed an immediate threat to Officer Reyes.  Defendants contend that there can be no factual dispute as to whether Russell posed an immediate threat to Officer Reyes because Officer Reyes' account of the

---

[7] The Court notes that Defendants object to Plaintiff's reliance on a medical screening card indicating that Plaintiff was not injured at the time he arrived at the station on the basis that it is hearsay.  *See* Reply at 2-3; Lagos Decl., Ex. G.  Because Plaintiff's own declaration is sufficient to create a fact question on this issue, the Court need not address whether the medical screening log would be admissible under an exception to the hearsay rule.

14

relevant events is the *only* account of what occurred, given that Russell admits that he does not remember what happened, there were no eyewitnesses and there is no video footage.   The Court disagrees.  The situation here is analogous to cases in which the individual against whom the alleged excessive force was used was killed and thus is unable to testify.  It is well-established that under such circumstances, "the court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  Rather, "[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id*.  Thus, "[t]he judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.*

Here, Russell has presented circumstantial evidence that he is unlikely to have acted aggressively because of a medical condition that would have made it painful to kick anyone;  he also contends that because he did not resist Officer Stratton when she placed him in handcuffs he is entitled to an inference that he was not aggressive towards Officer Reyes.  This evidence by itself would not provide a sufficient basis on which a reasonable jury could conclude that Officer Reye's account was inaccurate and that Russell did not pose an immediate threat to Officer Reyes, applying an objective standard.  It is undisputed that Russell had consumed at least 10-11 drinks; that he repeatedly said "fuck you" to Officer Stratton when she placed him in handcuffs, and that Officer Reyes heard "loud banging, kicking, and yelling noises coming from the holding area."  There is no evidence that there was anyone but Russell in the holding area.  In light of these undisputed facts, any inference that Russell was *not* acting aggressively is speculative.

Nonetheless, fact questions remain as to whether Russell posed an immediate threat because Officer Reyes has given differing accounts as to what occurred in the moments leading up to his use of force.  In one account, he was kicked to the ground.  In another, it appears that he remained standing.  He has also offered conflicting accounts as to whether Russell was seated or standing when Officer Reyes struck him.  Whether Officer Reyes could have simply taken a step or two

15

backwards to avoid injury, as Russell contends, depends on which version of events the jury believes. Further, while Officer Reyes testified that he did not know if Russell was handcuffed to the stanchion and did not have time to check, which caused him to believe Russell posed an immediate threat, there is evidence in the record that prisoners were always handcuffed by at least one arm when placed in the holding area, as a matter of policy, and that Officer Reyes was not aware of any prisoner every being placed in the holding area without being handcuffed by at least one arm. Indeed, Officer Reyes testified at his deposition that when Russell was booked, he was satisfied that Russell had been handcuffed by one hand to the security bar even if he did not actually place the handcuff on Russell.[8] The officer's Incident report also supports this conclusion. A jury could reasonably conclude based on that evidence that Officer Reyes' belief that Russell posed an immediate threat that required the level of force that was used by Officer Reyes was not objectively reasonable. Therefore, the Court concludes that summary judgment on the question of whether Officer Reyes used excessive force is inappropriate.

### iii.    Whether Officer Reyes is entitled to qualified immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme Court has stated that the "driving force behind the creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Id*. (internal citations omitted). Thus, courts should resolve questions of qualified immunity "at the earliest possible stage in litigation." *Id*. at 231-32 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

---

[8] As noted above, the record is unclear as to whether Officer Reyes himself secured Russell in the holding area or if this was done by some other officer.

There are two questions in the qualified immunity analysis: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident.   *See Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson*, 555 U.S. at 232.  In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if  such a violation was found should it proceed to the question of whether the violation involved a clearly established right.   533 U.S. at 201.  In *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order.  555 U.S. at 236.  The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Id*. at 237.   Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case."  *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201.  It is not enough that the general rule is established.  *Id*.  Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S.  635, 640 (1987)).   Although the existence of a clearly established constitutional right is usually demonstrated on the basis of cases involving similar facts where the alleged conduct has been found to be unconstitutional, "[w]hen the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established."  *Deorle v. Rutherford*, 272 F.3d 1272, 1285-1286 (9th Cir. 2001) (quotation and citation omitted).   The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision."  *Saucier*, 533 U.S. at 205.

Here, the Court has found that there is a fact question as to whether Officer Reyes violated

17

Russell's Fourth Amendment right to be free from excessive force.  Therefore, Officer Reyes is entitled to qualified immunity at this stage of the case only if the Court finds that even assuming Officer Reyes used excessive force, he did so based on a reasonable, though mistaken, belief that under established case law, his conduct was reasonable. As discussed above, on summary judgment, the Court relies on undisputed facts and, where facts are disputed, must draw all reasonable inferences in favor of the party opposing summary judgment.  Depending upon what the jury finds transpired in the holding area prior to Officer Reyes' use of force, and drawing all reasonable inferences in Russell's favor, the jury could find that Officer Reyes knew that Russell was secured to a safety bar by a handcuff and that he could avoid injury by taking a step back. Under that version of events, a reasonable officer would have known under the preexisting case law that punching Russell in the face constituted excessive force under the Fourth Amendment even in the absence of a closely analogous case.  *See Palmer v. Sanderson*, 9 F.3d 1433, 1434-36 (9th Cir. 1993) (holding that where officer placed intoxicated individual in handcuffs and handcuffs were so tight they caused pain and bruising for weeks, defendant officer was not entitled to summary judgment of qualified immunity because "no reasonable officer could believe that the abusive application of handcuffs was constitutional").

      **iv.**   *Monell* **Claims**

           **a.**   **Legal Standard**

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.  A plaintiff seeking to establish municipal liability under section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the constitutional violation was an official with "final policy-making authority and

United States District Court
Northern District of California

that the challenged action itself thus constituted an act of official government policy;" or 3) the plaintiff may demonstrate that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

### b.  Claim Two (Policy and Practice of  Excessive Force)

In Claim Two, Russell alleges that the City has been deliberately indifferent to a pattern and practice by officers of using excessive force, amounting to a ratification of the police officers' unconstitutional acts.  Although Russell refers to "ratification," there is no evidence in the record that any official with final policy-making authority ratified Officer Reyes' conduct.  Although a use of force investigation was conducted by Officer Morales, Defendants do not contend Officer Moreles has final policy-making authority;  moreover, Officer Morales conceded  that he did not document his investigation in a written memorandum to his supervisor, much less to any individual with final policy-making authority.  Thus, the question before the Court is whether Plaintiff can establish that Officer Reyes was acting pursuant to a "longstanding practice or custom which constitutes the standard operating procedure" of the San Francisco Police Department, of condoning the use of excessive force.  The Court finds  that Plaintiff has not offered sufficient evidence to demonstrate the existence of a fact question on this issue.

A municipality may be held liable for a constitutional violation where it is shown that the violation resulted from a policy of deliberate indifference on the part of the municipality to the rights of its inhabitants.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Post-event evidence may be probative of such a policy.  *See Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).  In *Henry*, the court cited a Fifth Circuit case, *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) as the "leading case on the use of post-event evidence in § 1983 liability cases" and noted that *Grandstaff*  had been cited with approval in previous Ninth Circuit decisions.  *Id.* (citing *Larez v. City of Los Angeles,*, 946 F.2d 630 (9th Cir. 1991) and *McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986)).  In *Grandstaff*, the Fifth Circuit affirmed a jury verdict against the city where members of the police force "mistook an innocent person as a fugitive and killed him."  *Id.* (citing *Grandstaff*, 767 F.2d at 117).   The court recognized that isolated instances of official

19

1   misconduct are insufficient to establish municipal liability but found that "the police chief's failure

2   to respond to the situation or make changes in order to prevent recurring violations evidenced the

3   city's preexisting policy of deliberate indifference to the dangerous recklessness of its police

4   officers." *Id*.

5           Cases in which failure to reprimand has been found to show the existence of a pattern and

6   practice of deliberate indifference typically involve evidence of "a blatantly unconstitutional

7   course of treatment." Id. *at 520*.  For example, in *Henry*, the court found that there was sufficient

8   evidence to survive summary judgment as to the plaintiff's *Monell* claim where the municipality

9   failed to fire or reprimand any officers after the plaintiff had been thrown naked into a "rubber

10  room" and held there for ten hours or more for failing to sign a traffic ticket.  *Id*.  There was

11  evidence that the Plaintiff had received similar treatment on a previous occasion, and two other

12  individuals submitted affidavits that they also had been treated in a similar manner for minor

13  traffic infractions.  *Id*.  In *McRorie*, the plaintiff alleged  "that a prison guard attempted to plunge

14  a riot stick into [the plaintiff's]  anus during a strip search after a shakedown," that the guard was

15  acting under the orders of his superiors, and that 28 other inmates were also seriously injured

16  during the  strip search, showing that the attack was not an isolated incident.  795 F.2d at 781-782.

17  The Ninth Circuit held that the district court had erred in dismissing the plaintiff's claim for

18  failure to state a claim, finding that he should be permitted to amend his complaint to allege, if he

19  could, "that the prison officials took no steps to reprimand or discharge the guards, or if they

20  otherwise failed to admit the guards' conduct was in error."  *Id*.  Citing *Grandstaff*, the court

21  reasoned that such conduct would support an inference that there was a policy or custom of

22  deliberate indifference.  *Id*.

23          Statements made after an event may also support an inference as to the existence of a

24  policy or custom of deliberate indifference.  In *Larez*, for example, the police chief made a

25  statement outside the courthouse during the trial in an excessive force case that the plaintiff was

26  lucky he had only gotten a broken nose.  946 F.2d at 636.  The court held that "[w]here the

27  principal allegations in this case include among them that [the police chief] set a tone which

28  condoned and encouraged the use of excessive force, we can hardly think of better evidence than

United States District Court
Northern District of California

statements consistent with those claims." *Id*. at 645.   In *Sepatis v. City and County of San Francisco*, 217 F. Supp. 2d 992 (N.D. Cal. 2002), the court held that post-event testimony by one of the arresting officers that "departmental policy permits an officer to make a warrantless entry into a home with a supervisor's approval, notwithstanding the absence of exigent circumstances" was sufficient to give rise to a fact question that precluded dismissal of the plaintiff's *Monell* claim on summary judgment.

Here, in contrast to the facts in *McRorie* and *Henry*, there is no evidence regarding other similar incidents of excessive force.   While there is evidence that Officer Morales had conducted between 20 and 25 use of force investigations during his tenure at the Richmond station and had never found that excessive force was used, Plaintiff has not offered any evidence from which a jury could reasonably find that Officer Morale's conclusions were incorrect as to any of those investigations.   Nor has Plaintiff cited any statements comparable to those in *Larez* and *Sepatis* that would support the conclusion that the SFPD condones excessive force under circumstances such as the ones in this case.   Accordingly, the Court concludes that Defendants are entitled to summary judgment on Claim Two.

### c.   Claim Seven (Policy and Practice of Inadequate Training)

In Claim Seven, Plaintiff asserts a *Monell* claim based on "negligent selection, training, retention, supervision, investigation and discipline."   With respect to the City's alleged negligent investigation and discipline, the Court finds that this claim duplicates Claim Two and therefore dismisses the claim as to those theories.   To the extent the claim is based on inadequate selection, training and supervision, the Court finds that Plaintiff has offered no evidence other than the evidence discussed in reference to Claim Two and therefore dismisses the remainder of the claim on that basis.

### C.   State Law Claims

### i.   Assault and Battery, IIED and Negligence Claims

Defendants assert they are entitled to summary judgment on Plaintiff's state law claims asserting assault and battery, IIED and negligence against Officer Reyes for the same reason Plaintiff's excessive force claim fails, namely, the undisputed facts establish that Officer Reyes'

1    use of force was reasonable.  Because the Court finds that there is a question of fact on that issue,

2    the Court finds that summary judgment on these claims is inappropriate as well.

3              ii.    **Bane Act Claim**

4              Defendants seek summary judgment on Plaintiff's claim under California Civil Code §

5    52.1 (the Bane Act) on the grounds that Officer Reyes' use of force was reasonable and even if it

6    were not, Plaintiff cannot demonstrate that the alleged violation of his constitutional rights was

7    accompanied by "threats, intimidation, or coercion."  The Court rejects both arguments.

8    First, as discussed above, the Court finds that there are fact questions that cannot be resolved on

9    summary judgment as to whether Officer Reyes' use of force was reasonable.  Second, for the

10   reasons stated below, the Court rejects Defendants' argument that Plaintiff is required to establish

11   threats, intimidation or coercion independent of the alleged violation of his constitutional right to

12   be free of excessive force to prevail on his Bane Act claim.

13             California Civil Code § 52.1 gives rise to a claim where "a person or persons, whether or

14   not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to

15   interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or

16   individuals of rights secured by the Constitution or laws of the United States, or of the rights

17   secured by the Constitution or laws of this state."   To prevail on a Bane Act claim, a plaintiff

18   must demonstrate : 1) an act of interference with a legal right by 2) intimidation, threats or

19   coercion.  *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998).

20             Unlike a federal civil rights claim under 42 U.S.C. § 1983, a Bane Act claim may be

21   asserted against private individuals as well as state actors.  *Id.*  Nonetheless, where the claim is

22   brought against a private individual based on interference with the plaintiff's constitutional rights,

23   the plaintiff must demonstrate that a state actor engaged in unconstitutional conduct, as a private

24   citizen cannot directly violate the constitutional rights of another individual.  *Id.* at 334-335.  Thus,

25   in *Jones*, the California Supreme Court held that a Bane Act claim for alleged interference with

26   the plaintiff's Fourth Amendment rights based on a citizens' arrest was subject to dismissal

27   because although the plaintiff could establish that the defendants, all of whom were private

28   individuals, had used intimidation, threats or coercion in the course of conducting the arrest, the

United States District Court
Northern District of California

1    plaintiff could not show that his constitutional right to be free from excessive force had been

2    violated because no state actor was involved in the citizens' arrest. *Id*.

3         "Courts in California are split on whether a Fourth Amendment excessive force or false

4    arrest violation alone qualifies for the element of interference with a legal right under § 52.1."

5    *Haynes v. City and County of San Francisco*, 2010 WL 2991732, at * 6 (N.D.Cal., July 28, 2010)

6    (citing *Justin v. City and County of San Francisco*, 2008 WL 1990819, at *9 (N.D.Cal., May 5,

7    2008); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084, 1102

8    (N.D.Cal. 2005)).  In *Justin*, the court held that "Section 52.1 is only applicable when a defendant

9    intends by his or her conduct to interfere with a separate, affirmative right enjoyed by a plaintiff; it

10   does not apply to a plaintiff's allegation of use of excessive force absent a showing that the act

11   was done to interfere with a separate state or federal constitutional right." 2008 WL 1990819, at

12   *9.  On that basis, the court held that a Bane Act claim against San Francisco police officers who

13   were alleged to have used excessive force was subject to dismissal  on a motion for summary

14   judgment.  *Id*.

15        This court finds the reasoning in *Justin* unpersuasive.  In support of its conclusion, the

16   court in *Justin* relied on the California Supreme Court's decision in  *Jones* and a decision by a

17   district court in the Eastern District of California,  *Rios v. v. City of Fresno*,  2006 WL 3300452

18   (E.D.Cal., Nov. 14, 2006).  In *Rios,* the plaintiff asserted a Bane Act claim based on the allegation

19   that he was arrested without probable cause and that excessive force was used against him in the

20   course of the arrest.   On summary judgment, the court dismissed the Bane Act claim on the basis

21   that there was "no evidence that any defendant attempted to interfere with a specific constitutional

22   right by threats, intimidation or coercion, or by committing or threatening to commit a violent act

23   against plaintiff or that plaintiff reasonably believed that if he exercised a specific constitutional

24   right, defendants would commit violence against him."  2006 WL 3300452, at *20.  Implicit in the

25   court's holding was the assumption that conduct that constituted "intimidation, threats or

26   coercion" had to be independent of the conduct that constituted the constitutional violation.

27   However, the court did not cite any authority for this proposition or address the basis for its

28   conclusion.  Therefore, *Rios* does not provide strong support for the holding of *Justin*.

United States District Court
Northern District of California

23

Nor is the reliance in *Justin* on the *Jones* decision persuasive.   As discussed above, the California Supreme Court's decision in *Jones* stands for the proposition that where a Bane Act claim is asserted against a private individual based on alleged interference with the plaintiff's constitutional rights, the plaintiff must demonstrate some state action that deprived him of his constitutional rights because a private individual cannot violate the constitutional rights of another private individual.   In that context, a plaintiff will be required to demonstrate that there was conduct by a state actor that gave rise to a constitutional violation, separate and apart from whatever "intimidation, threats or coercion" is alleged as to the private individual.   That, however, was not the situation in *Justin* and it is not the situation here:   the Bane Act claim is alleged against police officers employed by the City and County of San Francisco, whose conduct can give rise to a constitutional violation.

The Court therefore declines to follow the approach taken in *Justin*.   Rather, the court agrees with Judge Hamilton, of this district, who has found that "district court cases, and a review of California case law suggest . . . that the best interpretation of the Bane Act as it currently stands is that section 52.1 does not require violence or threat of violence tied to a separate and independent right." *Goings v. Elliot*,  2010 WL 9474665, at *9 (N.D.Cal., Mar. 19, 2010).   In *Warner v. County of San Francisco*, 2011 WL 662993 (S.D.Cal. Feb. 14, 2011), in which a Bane Act claim was asserted on the basis of alleged excessive force, the court offered the following reasoning in support of this conclusion, which this Court finds persuasive:

> Defendants also argue that Plaintiffs have failed to state a § 52.1 claim because Plaintiffs have not identified threats, intimidation, or coercion independent of the alleged constitutional violation.   Defendants rely on *Justin v. City and County of San Francisco*, 2008 WL 1990819, at *9 (N.D.Cal. 2008), where the court held, "Section 52.1 is only applicable when a defendant intends by his or her conduct to interfere with a separate, affirmative right enjoyed by a plaintiff; it does not apply to a plaintiff's allegation of use of excessive force absent a showing that the act was done to interfere with a separate state or federal constitutional right." *Id.* at * 9.
>
> In *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 11 Cal.Rptr.3d 692, 87 P.3d 1 (2004), however, the California Supreme Court did not say anything about a requirement that the use of a threat, intimidation, or coercion be separate and apart from the alleged constitution violation. In *Venegas*, the plaintiffs brought a

24

claim under § 52.1 for unreasonable search and seizure. The California Supreme Court held that the California Court of Appeal correctly held that plaintiffs adequately stated a cause of action under § 52.1 because plaintiffs need only allege that the unconstitutional search and seizure violations "were accompanied by the requisite threats, intimidation, or coercion." *Id.* at 843, 11 Cal.Rptr.3d 692, 87 P.3d 1. (Emphasis added.) It does not appear that the plaintiffs in *Venegas* alleged that there was any use of force or coercion beyond the unreasonable search and arrest.

Based on *Venegas*, courts within the Ninth Circuit have disagreed with *Justin*, and have held that plaintiffs may base a § 52.1 claim on the threats, intimidation, or coercion exercised in connection with the alleged use of excessive force or unreasonable search or seizure.  For example, in *Haynes v. City and County of San Francisco*, 2010 WL 2991732, at * 7 (N.D.Cal. July 28, 2010), the court held that the act underlying the excessive force claim— pushing plaintiff into the wall—was sufficient evidence to create a genuine issue of material fact as to whether the defendant acted with threats, intimidation, or coercion. See also *Knapps*, 647 F.Supp.2d at 1168 (explaining that because the force used by the defendant officers was excessive, the defendants were liable under § 52.1— "The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim ."); *Moreno v. Town of Los Gatos*, 267 Fed. Appx. 665 (9th Cir.2008) (reversing dismissal of § 52.1 claim because officers' threat to arrest some of the plaintiffs and actual arrest of others may have coercively interfered with their Fourth Amendment rights).

The Court is not convinced that § 52.1 requires that there be threats, intimidation, or coercion beyond the unconstitutional use of force or unreasonable search or seizure. Accordingly, the Court denies Defendants' motion as to Plaintiffs' § 52.1 claim.

*Id*. at * 4-5.

Because the Court finds that Plaintiff is not required to establish a separate constitutional violation independent from the alleged "threats, intimidation or coercion," and because there is a fact question as to whether the force used against Russell was reasonable, the Court denies Defendants' request for summary judgment as to the Bane Act claim.

### iii.    State Law Claims Against the City

Plaintiff asserts his claims for battery, IIED, negligence and violation of the Bane Act against both Officer Reyes and the City.  Defendants did not respond to Plaintiff's assertion, in his opposition brief, that liability may be asserted against the City under California Government Code § 815.2(a).  Section 815.2(a) provides as follows:

A public entity is liable for injury proximately caused by an act or

United States District Court
Northern District of California

1

> omission of an employee of the public entity within the scope of his
> employment if the act or omission would, apart from this section,
> have given rise to a cause of action against that employee or his
> personal representative.

Cal. Gov't. Code § 815.2(a).   On the basis of this section, the Court rejects Defendants' assertion

that they are entitled to summary judgment as to the state law claims insofar as they are asserted

against the City.[9]

### iv.   Claim for Injunctive and Declaratory Relief

Defendants seek dismissal of Plaintiff's claim for injunctive and declaratory relief, arguing

that the likelihood that the conduct at issue will be repeated is speculative.  Defendants rely on

*City of Los Angeles v. Lyons*, in which the Ninth Circuit held that the plaintiff, who had alleged

that he had been subjected to excessive force when a police officer held him in a chokehold, did

not have standing to seek injunctive relief because he had not alleged facts showing a "real and

immediate threat" that the alleged unconstitutional conduct would be repeated.  461 U.S. 95, 105

(1983).   Plaintiff cites an alleged pattern and practice of using excessive force in support of these

claims.  However, as discussed above, the Court finds that Plaintiff has failed to demonstrate the

existence of a fact question as to the existence of a pattern and practice.  Therefore, the Court also

finds that Plaintiff's claims for injunctive and declaratory relief fail on summary judgment.

---

[9] Although the parties did not offer any case authority in support of their positions, the Court notes that *in Darraj v. County of San Diego*, 2013 WL 1796990, at * 15 (S.D.Cal., April 29, 2013), the court expressly held that the County could be sued under the Bane Act, relying on the "person or persons" language of the Bane Act, and in addition, that under Section 815.2(a) a municipality may be held vicariously liable  for violation of the Bane Act;   *see also Quinn v. Fresno County Sheriff*, 2012 WL 2052162, at *11 (E.D.Cal., June 06, 2012) (finding that the County could be held vicariously liable on negligence and IIED claims based on the conduct of one of its police officers under Cal. Gov't Code § 815.2(a)).

**IV.   CONCLUSION**

For the reasons stated above, the Motion is GRANTED with respect to Claims Two and Seven (the *Monell* claims) and on Claim Nine, for injunctive and declaratory relief.   As to Plaintiff's remaining claims, the Motion is DENIED.

IT IS SO ORDERED.

Dated:   June 5, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California